**HILDRETH CONSULTING ENGINEERS, P.C., & Colonia Insurance Company, Appellants,**

v.

**LARRY E. KNIGHT, INC., Appellee.**

**No. 01–CV–23.**

District of Columbia Court of Appeals.

Argued April 24, 2002.
Decided June 27, 2002.

Robert C. Kostecka, Bethesda, MD, for appellants.

Andrew N. Cook, with whom Michael J. Schrier, Washington, DC, was on the brief, for appellee.

Before TERRY, FARRELL, and REID, Associate Judges.

FARRELL, Associate Judge.

Hildreth Consulting Engineers, P.C. ("HCE") and Colonia Insurance Company ("Colonia"), defendants below, seek review of a non-jury trial award of $49,692.99 to appellee Larry E. Knight, Inc. ("Knight") covering the remaining balance due on a series of agreements for the manufacture and delivery of concrete planks used in connection with the construction of a parking garage for the Edgeworth Terrace Preservation Corporation ("Edgeworth").[1] Appellants' counterclaim, premised on remedial efforts taken by HCE to repair the alleged non-conforming goods, was denied in its entirety. On appeal, appellants principally argue that the trial judge erred in not granting a set-off based on their counterclaim. Appellants also assert that the judge erred in awarding interest, pursuant to D.C.Code § 15–108 (2001), upon the overdue delivery fees when the agreement respecting delivery, unlike the original manufacture contract, failed to include a provision charging interest on a delinquent account. We hold that the trial judge properly concluded that appellants failed to prove their damages sufficiently, and did not err in applying the interest provision from the original agreement after finding that the second agreement was only a modification of the first. Accordingly, we affirm.[2]

**Background**

The dispute arises out of two agreements—or, as the trial judge found, an agreement and a later modification—made between HCE and its subcontractor, Knight. In August 1997, Knight and HCE entered into a written agreement by facsimile in which Knight promised to supply the concrete planks "F.O.B. Plant [in Baltimore]" for $132,975.00. The terms of this contract required HCE to pay ninety percent of the contract price upon delivery of the goods at Knight's place of business in Baltimore, the outstanding balance to be paid the following month. The agreement included a monthly 1.5% interest charge to be assessed on unpaid balances. In September of the same year, HCE's President, John Hildreth, telephoned Knight and requested that it deliver five loads of the planks so HCE could begin its work on the garage. Knight responded with a fax confirming it would deliver the loads. Later the same day, Mr. Hildreth telephoned Knight asking the company to ship the rest of the materials. Knight sent a fax confirming this request, promising to deliver the full "55 loads [at] $310.00 for the sum of $17,050.00." The confirmatory faxes did not reference terms of the original August contract or provide for an interest rate on late accounts. Sometime after transmittal of the faxes, Mr. Hildreth sent Knight a letter (Exhibit 39) stating in part that "we will pay you in full [for the delivery costs] with no retainage for trucking the same day we receive the check from [Clark]."[3] The parties exchanged no further correspondence about the terms of delivery. Knight's invoice billing HCE for the delivery fees totaled $18,790.00.

The planks were constructed and delivery was made in full by the beginning of

---

1. The agreement specifically provided for "approximately 31,300 [square feet] of ... quad[rangle] tees, columns and beams." For clarity purposes, we will refer to these items collectively as "planks."

2. Initially, appellant Colonia challenged the imposition of delivery costs against it as a surety, but withdrew this claim at oral argument.

3. Clark Construction Group ("Clark") was the prime contractor on the project.

October, 1997. At that time, HCE paid Knight $119,677.50 as required by the August agreement, leaving a balance of $13,297.50. HCE paid none of the transportation costs at this time.

After demolition of the original garage and substantial erection of the new structure, several dimensional surveys were conducted at the site. Their main purpose was to identify the reason why a distance gap had resulted between the existing bearing wall and the new garage. During these surveys, several members of the various contracting groups discovered that many of Knight's planks had begun to show signs of spalling[4] and honeycombing[5] of the concrete. According to Mr. Hildreth's testimony, although some of these conditions were seen prior to the erection, the increased load placed on the planks following their placement greatly increased the severity of the conditions, and some planks sustained cracking under their own weight. As a result of these defects, HCE conducted chipping tests on the planks, which consisted of tapping the edge and top of the planks to inspect the strength of the concrete. This resulted in the breakage of one to three inches of concrete off some planks, increasing the distance gap. The ease with which the cracks formed led Mr. Hildreth to believe there existed a weakness in the bearing capacity of the planks, which could eventually lead to the structure's collapse.

Concerned about the planks' bearing capacity, HCE and the other contractors agreed to install continuous, galvanized support angles throughout the garage to distribute the weight placed on the planks toward more structurally sound portions of the concrete. This solution was chosen, according to Mr. Hildreth, because the "sheer cost of removing all of [the] plank[s] and then replacing [them] with newly formed plank[s] was significantly greater than ... installing the angle[s]." Installing these angles also prevented significant delays in the project's completion, which would have caused substantial costs. The cost of the support angles was $19,950.00, but the prime contractor, Clark, agreed to reimburse HCE for that cost. Although HCE claimed to have incurred $15,000.00 in related labor costs, at trial it submitted no itemized list or other documentary evidence detailing the number of workers and manhours necessary to complete the installation of the angles.

HCE claimed additional costs from the plank defects. It was charged for the grout used to fill the gap in the beams and reinforce the spalling concrete (approximately $52,000.00), and Clark backcharged HCE for the installation of expansion joints ($4,800.00) and garage offsets[6] within the concrete ($8,985.00), as well as costs associated with cleanup of the garage ($635.00) and the grinding of the garage beams ($4,247.00), necessary to remove excess grout that had accumulated down the side of the planks. Finally, Mr. Hildreth placed in evidence a letter indicating that HCE had spent over ninety manhours, at a billing rate of $60.00/manhour, in completing the original dimensional survey. Al-

4. According to the testimony of one of Knight's employees, spalling is the development of cracks and crumbling of concrete around the top edge of the plank, usually caused by stress when the plank is lifted by a crane.

5. Honeycombing occurs when concrete is improperly vibrated, creating an unsmooth texture to the concrete due to a lack of consolidation.

6. These offsets were necessary because the camber between some of the planks was inconsistent, meaning the weight of the structure had caused some of the planks to bend and sag in the middle differently, creating a tripping hazard between them.

though Clark agreed to reimburse HCE for $29,985.00 in fees related to the grout (as well as $19,950.00 in fees related to the installation of the support angles), HCE received no repayment for the remaining funds it expended. As a result, HCE withheld payment on the remainder of its balance to Knight.

The non-jury trial spanned three days, concluding January 5, 2000, at which point the trial judge made oral findings. He found that Knight was entitled to the balance remaining for the manufacturing of the planks, as well as the full amount for transportation, because Knight had fully performed under the contract. He also granted monthly interest of 1.5% pursuant to D.C.Code § 15–108 on the amount remaining under the contract. In granting the interest, the judge reasoned, "I'm going to take the same rate of interest that the parties agreed to with respect to the overall contract, which is [1.5%]."

The judge then focused on appellants' counterclaim. Although finding that some of the planks were defective,[7] he expressed great difficulty in identifying the damages related to appellee's breach, stating:

I believe that with respect to any number of different costs that have been identified as damages, there's been a failure of proof. I believe that [appellants have] failed to prove by a preponderance of the evidence to the fact finder's satisfaction the extent ... of damages on a number of items. With respect to labor costs, I have no documents to support that. Although they obviously did, I can't speculate.... Even if they're internally borne, there presumably are records indicating that there was so many manhours done....

He also found insufficient support for damages related to the application of grout and the garage cleanup, stating:

I don't believe that there's a sufficient basis in the record for some of the other costs. How things were negotiated and how things were arrived at [regarding the apportionment of costs between Clark and HCE], the record in fact clearly reveals to me that there was a lot of negotiation.... I don't see how, in whatever negotiations that took place between either [Mr. Hildreth] or his company and Clark or any [subcontractor], ... how that could be reasonably apportioned and what that was for, quite frankly.

Although the judge expressed the tentative belief that appellants had proven at least part of their damages, he stated that he would detail his findings in a written order. That order was entered on November 28, 2000. In it, he entered judgment for appellee in the total amount of $49,692.99, including interest from November 7, 1997, through November 17, 2000. He denied appellants' counterclaim in its entirety.

### Discussion

■ "When the case [is] tried without a jury, the court may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (2001); see *Wheeler v. Goulart,* 593 A.2d 173, 173–74 (D.C.1991). "That standard means that if the trial court's determination is plausible in light of the record viewed in its entirety, we will not disturb it whether or not we might have viewed the evidence differently

---

7. On appeal, appellee does not dispute that some planks shipped were non-conforming goods.

ourselves." *Nolan v. Nolan*, 568 A.2d 479, 484 (D.C.1990) (citations omitted). "Where the facts admit of more than one interpretation, the appellate court must defer to the trial court's judgment." *Davis v. United States*, 564 A.2d 31, 35 (D.C.1989) (citations omitted). We review *de novo* the trial court's legal conclusions. *See id.*

## I. Damages

Appellants first argue that the trial judge erred in failing to award a set-off against Knight's judgment. We disagree. Appellants have not persuaded us that the judge clearly erred in finding an insufficient causal connection between the defects in appellee's planks and many of the remedial efforts appellants undertook. Moreover, the judge could properly find that appellants had failed to provide an accurate measure of damages on which to base an award.[8]

■ "In a breach of contract action, the measure of damages is the amount necessary to place the non-breaching party in the same position he or she would have been in had the contract been performed." *Rowan Heating–Air Conditioning–Sheet Metal, Inc. v. Williams*, 580 A.2d 583, 585 (D.C.1990). "The trial court's award [of damages] will be upheld as long as it is a just and reasonable estimate based on relevant data, even if it is not proven with mathematical precision." *Affordable Elegance Travel, Inc. v. Worldspan, L.P.*, 774 A.2d 320, 329 (D.C.2001) (citations omitted). Of course, "[d]amages may not be based on mere speculation or guesswork. The evidence offered must form an adequate basis for a reasoned judgment." *Vector Realty Group, Inc. v. 711 Fourteenth St., Inc.*, 659 A.2d 230, 234 (D.C. 1994) (citation and internal quotation marks omitted). And damage calculations must be sufficiently detailed to support an award. *See District Concrete Co. v. Bernstein Concrete Corp.*, 418 A.2d 1030, 1038 (D.C.1980). Damages may be awarded only when the party claiming them has adequately demonstrated that the opponent's breach caused the harm suffered. *Kakaes v. George Washington Univ.*, 790 A.2d 581, 586 (D.C.2002); *W.G. Cornell Co. v. Ceramic Coating Co.*, 200 U.S.App. D.C. 126, 129, 626 F.2d 990, 993 (1980) (reversing an award of cleanup costs when appellant had failed "to present any evidence that cleanup was made more onerous by [appellee's] breach or of the cost attributable to the assertedly added burden").

■ First, many of the costs appellants claimed they had incurred were not shown to be directly caused by appellee. That is, appellants failed to distinguish between costs they incurred as a result of appellee's defective planking and costs that would have been borne even without a breach. For the costs related to the use of grout, appellants offered no evidence that the grouting was a remedial effort necessary to correct the defective planks. Instead, the testimony revealed that the grout was used to fill the gaps created by the *erection* of the planks, or because of a design flaw in the project. Mr. Hildreth even testified that he considered the use of grout to be "Clark's responsibility." Although Clark agreed to pay $29,985.00 to remediate, leaving the balance to HCE, appellants provided meager evidence as to

8. Appellants argue that there is an inconsistency between some of the judge's oral findings and his written rejection of the counterclaim. We find no such inconsistency. The judge's written ruling signifies that, although appellants had proven the planks were defective, they had failed to establish by a preponderance of the evidence that the resulting damages were related to any defects, and had failed sufficiently to demonstrate the actual value of damages sustained.

how Clark arrived at that figure or why Knight was fairly responsible for the remaining balance.

Regarding the costs associated with expansion joints, garage offsets, cleanup and grinding, the record contains no evidence demonstrating why those costs were associated with the defective planks. According to the plans, the joints were necessary to reinforce the concrete during extreme temperature fluctuation; by contrast, appellants presented no expert testimony as to why the spalling and honeycombing of the planks caused the need for expansion joints and offsets. Consequently, the trial judge had little basis for deciding how a conforming, non-defective piece of concrete would have reacted differently from those supplied by appellee. Finally, the cleanup of the facility and of the excess grout appears to have been a byproduct of garage construction rather than a result of concrete spalling. Although it is clear that HCE incurred these additional costs, there is no evidence contradicting the judge's conclusion that the costs were not associated with appellee's manufacture of non-conforming goods.

Finally, appellants failed to provide a reasonable measure of damages concerning their remedial labor costs.[9] For labor costs regarding the field surveys, appellants introduced a letter indicating that HCE had spent over ninety manhours, at a billing rate of $60.00/manhour, in completing the surveys. The letter, however, only speculates as to the number of manhours spent on the project; and HCE provided no further evidence or testimony regarding this cost. For labor fees related to the installation of the galvanized angles, appellants offered only Mr. Hildreth's testimony that HCE had spent approximately $15,000.00 to install the angles.[10] Again, however, HCE submitted no invoice, business record, or other documentation specifying the number of individuals employed on the project, the number of hours expended to install the angles, or the billing rate. See District Concrete Co., 418 A.2d at 1038 n. 15 (damages estimated in testimony were supported by documented expenditures for "items such as trailer rent, heat and electricity, telephones, equipment rental, [and] field payroll"). Since nothing of this kind corroborated Mr. Hildreth's estimate of the costs incurred, the trial judge could properly find that the estimate was essentially guesswork.

## II. Interest on Transportation Costs

Appellants next contend the trial judge erred in imposing the 1.5% delinquent account interest rate for the unpaid delivery fees.[11] They rely on the fact that

---

9. Although we frame this issue as a lack of a reasonable estimate of damages, the trial judge could also fairly conclude that the labor costs relating to the field surveys were not incurred as a result of appellee's breach. As the testimony indicates, the surveys had a two-fold purpose: to determine any problems with bearings from the architectural and design standpoint, and to determine if Knight had conformed to the specifications required by the contract.

10. We do not consider appellants' attempt to recover the material costs of the galvanized angles, because the record reveals that Clark reimbursed HCE for those costs. According

to Mr. Hildreth's testimony, "I actually felt as though the material cost was also our requirement. But a change order was given to us by Clark for [$19,985.00] to pay for the material. So, we . . . bore the responsibility of the labor cost of the installation."

11. The judge expressly acted pursuant to D.C.Code 15–108, which provides:

In an action in the United States District Court for the District of Columbia or the Superior Court of the District of Columbia to recover a liquidated debt on which interest is payable by contract or by law or usage the judgment for the plaintiff shall include interest on the principal debt from

the September delivery contract, separate and distinct from the August contract, included no interest rate provision for late accounts. Knight counters that the judge properly found as a matter of fact that the September contract constituted a modification, and thus no error occurred in charging delinquency interest under the whole contract. The trial judge did not err in applying the 1.5% interest rate to the unpaid delivery fees.

Generally, whether the contracting parties have executed a new agreement or instead modified their original agreement is a question of fact. *See Hershon v. Hellman Co.*, 565 A.2d 282, 283–84 (D.C.1989); *Gagnon v. Wright*, 200 A.2d 196, 198 (D.C.1964). *See also* 2A RONALD A. ANDERSON, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 2–209:12 (3d ed. 1997) ("Because the question[ ] of modification ... [is] dependent upon the intent of the parties or of one of the parties, it necessarily follows that ordinarily the questions involved are questions of fact."). Modification of a contract normally occurs when the parties agree to alter a contractual provision or to include additional obligations, while leaving intact the overall nature and obligations of the original agreement. *See, e.g., Enserch Corp. v. Rebich*, 925 S.W.2d 75, 83 (Tex.App.1996) ("Modification of a contract is some change in an original agreement which introduces a new or different element into the details of the contract but leaves its general purpose and effect undisturbed."), *cited in* ANDERSON, *supra*, § 2–209:12 (West Supp.

2001) ("A modification of a contract is some change in the original agreement [that] leaves the general purpose and effect of the contract unchanged."); *see also Horbach v. Kaczmarek*, 934 F.Supp. 981 (N.D.Ill.1996) (storage agreement was a modification of original purchase order, instead of a new contract, when the agreement merely supplemented the original purchase order). Contracting parties may modify a written agreement by subsequent oral communications, *Gagnon*, 200 A.2d at 198, unless a clause bars such modification. *See Marlowe v. Argentine Naval Comm'n*, 257 U.S.App. D.C. 225, 228, 808 F.2d 120, 123 (1986); D.C.Code § 28:2–209(2) ("A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded....").[12]

The trial judge determined that the September 1997 communications amounted only to a modification of the earlier contract. Despite some ambiguity in his discussion of the issue, his oral findings of fact demonstrate that he viewed both agreements as a single contract. Thus, he stated that "there was indeed *a contract* ... for the supplying of planks *and* the delivery of the planks" (emphasis added), and later referred to the agreements as one "overall contract." At no point did he appear to treat the September exchanges as the formation of a new agreement. And, in his written decision, he applied the contractual interest rate to the outstanding balance on the unpaid delivery expenses, as required by § 15–108.[13]

the time when it was due and payable, at the rate fixed by the contract, if any, until paid.

**12.** Because the contract, in this case, even as modified, deals predominantly with the sale of goods, our analysis is guided by Article II of the District of Columbia Uniform Commercial Code, D.C.Code § 28:2–101 *et seq.*, to the

extent that the statute differs from the common law.

**13.** The fact that the parties squarely argued the issue of modification *vel non* to the judge confirms our conclusion that he did not leave the issue undecided. During appellants' motion for judgment as a matter of law, HCE's counsel argued that the September agreement

Sufficient evidence supports the finding of modification. Knight presented testimony that, despite use of the shipping term "F.O.B. Plant," Mr. Hildreth had asked him to deliver the planks and agreed to pay for the additional costs. Knight submitted documents memorializing Mr. Hildreth's oral request and the charge for the delivery, and specifically testified that he thought the shipping was considered a change of the original contract. Nothing in the August contract prohibited subsequent modification. And the agreement for Knight to deliver the planks at HCE's expense cannot be said to have changed the "general purpose and effect" of the contract, *see Enserch Corp., supra;* indeed, it did not change even the delivery term significantly, because HCE was to bear the *costs* of delivery regardless of who transported the goods.

In sum, we find no error in the determination that the parties had modified their contract. Pursuant to § 15–108, the judge thus properly applied the agreement's 1.5% monthly interest rate to the unpaid delivery costs.[14]

*Affirmed.*

was a separate contract, and counsel for both sides emphasized their position on the question during their closing arguments.

14. We reject appellants' additional argument that the judge erred in awarding interest for the period of time between the last date of trial, January 5, 2000, and November 17, 2000. Section 15–108 required the court to award interest from the date "when [the liquidated debt] was due and payable," in this case November 7, 1997, until payment was made. *See Spriggs v. Bode,* 691 A.2d 139, 144 (D.C.1997) (court erred by not awarding interest under § 15–108 when debt was liquidated). Appellants could have paid the amount under the contract at the time it was due and sued appellee rather than withhold-

ing payment and accruing interest. *See Giant Food, Inc. v. Jack I. Bender & Sons,* 399 A.2d 1293, 1305 (D.C.1979) (rejecting Giant's claim that inequity would occur in allowing "interest to run during the delay in payment occasioned by [p]laintiff's appeal").

Appellants' reliance on § 15–109 is unpersuasive. First, the judge did not award interest under that statute, which is discretionary in nature, but rather under § 15–108, which is mandatory. Second, § 15–109 is inapplicable to this situation. *See Riggs Nat'l Bank v. Carl G. Rosinski Co.,* 596 A.2d 997, 1000 (D.C.1991) ("[T]he optional provision of § 109 [does] not apply in situations where interest was mandated under § 108.").