*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-PR-628

ALDRAY REED, APPELLANT,

v.

FLORINE ROWE, APPELLEE.

FILED **11/15/2018**
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(LIT-6-13)

(Hon. Erik P. Christian, Trial Judge)

(Argued October 16, 2018                    Decided November 15, 2018)

*Darrel S. Parker* for appellant.

*Hughie D. Hunt* for appellee.

Before THOMPSON and MCLEESE, *Associate Judges*, and EDELMAN, *Associate Judge, Superior Court of the District of Columbia.*[*]

THOMPSON, *Associate Judge*: Plaintiff/appellant Aldray Reed ("Ms. Reed") appeals from a June 5, 2017, judgment of the Superior Court, entered upon the verdict in a bench trial, rejecting Ms. Reed's claim that upon the death of her husband MC Reed ("the decedent" or "Mr. Reed"), she, and not defendant/appellee

---

[*] Sitting by designation pursuant to D.C. Code § 11-707 (a) (2012 Repl.).

Florine Rowe, was entitled to the funds in an investment account that had been opened by the decedent years earlier as a joint account with rights of survivorship titled in the names of Mr. Reed and Ms. Rowe. Resolution of this matter requires us to apply the Uniform Nonprobate Transfers on Death Act (the "UNTDA"), D.C. Code §§ 19-601.01 – 604.19 (2012 Repl. and 2018 Cum. Supp.).[1]

For the reasons that follow, we affirm the judgment of the Superior Court.

**I.**

This litigation arose out of competing claims to the funds in Mr. Reed's RBC Wealth Management ("RBC Bank" or "the Bank") investment account following Mr. Reed's death on December 22, 2011. Mr. Reed opened the account many years before his marriage to appellant, which occurred on August 6, 2011. The investment account was a joint account with rights of survivorship titled in the names of Mr. Reed and Ms. Rowe, Mr. Reed's sister, but the trial court found that Mr. Reed "contributed all the funds in the RBC account[,]" received monthly

---

[1] The relevant provisions of the UNTDA in effect during the period in issue here were identical to those in the current codification.

checks from RBC Bank from the derivative income of the account, periodically made withdrawals from the account, and, during his lifetime, was the only person who made use of the funds in the account. In short, he was (at least prior to the events that gave rise to this litigation) the owner of the account. *See* D.C. Code § 19-602.11 (b) (2012 Repl.) ("During the lifetime of all parties, an account belongs to the parties in proportion to the net contribution of each to the sums on deposit, unless there is clear and convincing evidence of a different intent.").

The testimony at trial established that appellant and Mr. Reed met in the early 1990's, cohabited for a period of time, and discussed the prospect of marriage as early as 1996, notwithstanding their difference in age of approximately fifty to fifty-five years: Mr. Reed was in his 90's when the couple married in 2011, while appellant Ms. Reed was in her forties.

On July 5, 2011, Mr. Reed executed a last will and testament, which the trial court found was never superseded by a new will and in which he bequeathed "any and all available funds in [his] checking, savings and securities investment accounts[,]" including his accounts at Industrial Bank and his investment accounts held by RBC Bank, to Ms. Rowe, his sister. However, after Mr. Reed's marriage

to appellant on August 6, 2011, Mr. Reed and appellant began commingling their assets. For example, on August 12, 2011, Mr. Reed closed the savings and checking accounts he held as primary account holder at Industrial Bank, and on the same day, he and Ms. Reed used the funds withdrawn from those accounts to open a joint savings account and joint checking account at Industrial Bank, both entitled in the names of Mr. Reed and Ms. Reed with rights of survivorship. As another example, the trial court found that Ms. Reed held an account at RBC Bank as sole owner, and that she transferred the funds from that account to open another account at RBC Bank titled in her name and the name of Mr. Reed as joint tenants with rights of survivorship. The trial court found that the RBC Bank form used to accomplish that change was signed by Ms. Reed and Mr. Reed on October 3, 2011. RBC Bank investment advisor Timothy Stocker testified that he signed that form on September 28, 2011.

Much of the testimony at trial focused on what occurred when the Reeds went to RBC Bank on August 23, 2011, and met with Mr. Stocker, who had been Mr. Reed's investment advisor since 1994. According to Ms. Reed's testimony, the couple went to the Bank on that date to execute the necessary documents to remove Ms. Rowe's name from the investment account at issue here and to replace it with Ms. Reed's name as the joint owner of the account with a right of

survivorship. Appellant testified that Mr. Stocker gave Mr. Reed the bank's form (the "Transfer Form") to be used to cancel the existing RBC account and to transfer ownership of the account and create a new joint account with rights of survivorship, and that Mr. Reed signed the Transfer Form during the August 23, 2011, meeting with Mr. Stocker. According to appellant, Mr. Reed and she asked Mr. Stocker to mail the Transfer Form to Ms. Rowe for her signature, which was required under the Bank's policy. The record indicates that Ms. Rowe received the document on or before September 2, 2011, but refused to give her signature relinquishing her interest in the account, stating that her refusal was "[i]n the best interest of [Mr. Reed], due to his sometimes lapse in memory and judgement [sic][.]"

By contrast, Mr. Stocker testified that the Reeds' visit to his office on August 23, 2011, was for the purpose of converting appellant's solely owned account to a joint account in the names of Mr. and Ms. Reed. Mr. Stocker testified that he had no recollection "of any other business being conducted" with the Reeds during the August 23, 2011, meeting. Mr. Stocker testified that he "definitely" and "absolutely" did not "[receive] any written authorization signed by M.C. Reed to retitle his account in any way[.]"

The trial court found that Mr. Stocker prepared the Transfer Form, that Mr. Reed signed it on August 23, 2011, and that appellant mailed the signed Transfer Form to Ms. Rowe for her signature. The court also found that Ms. Rowe received the form and thereafter sent Mr. Stocker her letter dated September 2, 2011, stating that she would not sign the form out of concern for Mr. Reed's "sometimes lapse in memory and judgement [sic][.]" The court also found that later, pursuant to a request from Mr. Reed via telephone, Mr. Stocker sent a second (unsigned) Transfer Form to Ms. Rowe. Ms. Rowe refused to sign the second Transfer Form as well.

In light of Mr. Reed's request by telephone, the court found that Mr. Stocker recognized that Mr. Reed wanted to remove Ms. Rowe's name from the RBC account, i.e., "had actual notice of Decedent's intent to discontinue **[**Ms. Rowe's**]** joint ownership title to the RBC Account." The trial court also found, however, that while RBC Bank "had actual notice of Decedent's intent to change the title ownership of the RBC Account," appellant, "failed to show that RBC Bank received the required signed written notice and thus . . . failed to show that title ownership of the RBC Account was altered." In addition, the trial court determined that Ms. Reed had failed to prove that the RBC account was given to Ms. Reed as an *inter vivos* gift. The court ruled that Ms. Rowe "rightfully received

the RBC Account as the surviving joint owner with right of survivorship by operation of law upon Decedent's death."

This appeal followed. Appellant contends the trial court clearly erred in finding that RBC Bank did not have signed written notice of Mr. Reed's intent to alter the account by making her a joint owner with survivorship rights. She also argues that it was enough — to establish her rightful ownership of the RBC account — that the Bank had actual notice of Mr. Reed's intent to alter the account. In addition, Ms. Reed renews her claim in the alternative that she is the rightful owner of the RBC account because it was an *inter vivos* gift from Mr. Reed.

## II.

In our review of a judgment following a bench trial we, "may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C. Code § 17-305 (a) (2012 Repl.). "Under this standard of review, we view the evidence in the light most favorable to the prevailing party . . . and we

defer to the trial court's credibility determinations unless they are clearly erroneous." *Ross v. Blackwell*, 146 A.3d 385, 387 (D.C. 2016) (internal quotation marks, brackets, and citation omitted). The 'plainly wrong' standard "means that if the trial court's determination is plausible in light of the record viewed in its entirety, we will not disturb it whether or not we might have viewed the evidence differently ourselves." *Hildreth Consulting Eng'rs, P.C. v. Larry E. Knight, Inc.*, 801 A.2d 967, 971-72 (D.C. 2002) (internal quotation marks omitted). It means that "[w]here the facts admit of more than one interpretation, [we] must defer to the trial court's judgment." *Id.* at 972 (internal quotation marks omitted). "A finding is clearly erroneous 'when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Murphy v. McCloud*, 650 A.2d 202, 209-10 (D.C. 1994) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

"This court reviews legal conclusions *de novo*." *Vizion One, Inc. v. District of Columbia Dep't of Health Care Fin.*, 170 A.3d 781, 789 (D.C. 2017). "[T]he construction of a statute raises a clear question of law, and we review the trial court's ruling *de novo*." *Jackson v. United States*, 819 A.2d 963, 965 (D.C. 2003) (internal quotation marks omitted).

**III.**

**A.**

The UNTDA provides that "[e]xcept as otherwise provided in this subchapter, on death of a party sums on deposit in a multiple-party account belong to the surviving party or parties." D.C. Code § 19-602.12 (2012 Repl.). Particularly pertinent here, it further provides that:

> (a) Rights at death under section 19-602.12 are determined by the type of account at the death of a party. *The type of account may be altered by written notice given by a party to the financial institution to change the type of account or to stop or vary payment under the terms of the account. The notice must be signed by a party and received by the financial institution during the party's lifetime.*
>
> (b) A right of survivorship arising from the express terms of the account, section 19-602.12 . . . may not be altered by will.

D.C. Code § 19-602.13 (a), (b) (2012 Repl.) (italics added).[2]

---

[2] "'Receive' . . . means receipt in the office or branch office of the financial institution in which the account is established[.]" D.C. Code § 19-602.01 (9) (2012 Repl.).

Thus, in order for Mr. Reed to alter the RBC investment account to create joint ownership of the account with appellant and to confer a right of survivorship on her (instead of Ms. Rowe) pursuant to the UNTDA, Mr. Reed had to provide RBC Bank with written notice signed by him of his intent to make those changes in the account. The trial court found, as noted above, that RBC Bank had actual notice of Mr. Reed's intent to remove Ms. Rowe from the RBC account, but also found that "Mr. Stocker's testimony that he did not see Decedent's signature on the . . . Transfer Form during Decedent's lifetime" was "credible." The court therefore found that the Bank "did not have signed written notice during Decedent's lifetime of Decedent's intent to sever Defendant's interest in the RBC Account," with the result that a right of survivorship continued in Ms. Rowe.

We are satisfied that the trial court's credibility determination and its finding that Mr. Stocker did not receive a signed written alteration notice from Mr. Reed are not clearly erroneous.[3] To be sure, at least at first glance, some of the court's

---

[3]    We note that the court stated on page 13 of its Order that it was "inconclusive that Decedent signed the . . . Transfer Form in Mr. Stocker's presence." Of course, the applicable standard of proof was proof by a preponderance of the evidence, not "conclusive" proof, but we do not read the trial court's statement as a statement about the burden of proof. The court seems to have used the term "inconclusive" to mean that the testimony about what occurred during the meeting on August 23, 2011, was not "so strong as to overbear any

(continued…)

findings appear to be surprising if not contradictory. Most prominently, although finding Mr. Stocker credible and, notwithstanding Mr. Stocker's testimony that the focus of the August 23, 2011, meeting was on conversion of Ms. Reed's solely owned account and his lack of recall about whether the discussion during the meeting addressed altering the terms of the investment account that was in the names of Mr. Reed and Ms. Rowe, the court's findings reflect that it credited appellant's divergent testimony. Specifically, the court appears to have credited appellant's testimony that, during the August 23, 2011, meeting, Mr. Stocker prepared the Transfer Form that would serve to transfer funds from the Reed/Rowe account to a joint account in the names of Mr. Reed and appellant and that was sent to Ms. Rowe before September 2, 2011.[4]

---

(…continued)

other evidence to the contrary." *Conclusive Evidence*, BLACK'S LAW DICTIONARY (10th ed. 2014). The court then went on to consider the circumstantial evidence, which it found was "consistent with Mr. Stocker's testimony."

[4] As noted above, the court found that the form used to transfer funds from Ms. Reed's solely owned RBC Bank account, in order to open another account titled in her name and Mr. Reed's name, was not signed by Mr. Stocker until September 28, 2011, and was not signed by Ms. Reed and Mr. Reed until October 3, 2011. That finding seems consistent with appellant's testimony that this transaction was not the main order of business on August 23, 2011.

However, the court was permitted to credit some parts of appellant's testimony and not others.[5] The court found that appellant, not Mr. Stocker, mailed the signed Transfer Form to Ms. Rowe for her signature, a finding supported by Ms. Rowe's testimony that Ms. Reed sent her the signed Transfer Form. Thus, the court could permissibly find that Mr. Stocker, not having sent the signed form, also never saw the signed form on August 23. Further, the court's finding that Mr. Reed signed the form on August 23, 2011, was not tantamount to a finding that Mr. Reed signed the form in Mr. Stocker's office on that day. The form could, for example, have been signed later that day, after the Reeds had returned home from meeting with Mr. Stocker.

There are other reasons why, on the "entire evidence," we are not left with a conviction that "a mistake has been committed." *Murphy*, 650 A.2d at 210. First, the trial court found, based on the testimony, that Mr. Reed was Mr. Stocker's client for about seventeen years and that Mr. Stocker greeted Mr. Reed by name when Mr. Reed entered RBC Bank on August 23, 2011. From that, the court inferred — reasonably — that in light of the many years Mr. Stocker had managed

---

[5]  *See Brown v. 1401 N.Y. Ave., Inc.*, 25 A.3d 912, 916 n.7 (D.C. 2011) ("It is clear . . . that a finder of fact may credit some, but not all, of the testimony of a witness." (internal quotation marks omitted)).

Mr. Reed's investment account, Mr. Stocker would have been likely to remember important changes to Mr. Reed's account if they had occurred. Second, according to Ms. Reed's testimony, August 23, 2011, the day of the meeting with Mr. Stocker, was the day of the earthquake that was felt in Washington, D.C., and Ms. Reed testified that people "had to get out of the building" with some urgency before the meeting with Mr. Stocker had concluded. Although appellant testified that she saw Mr. Reed sign the form and asked Mr. Stocker to mail it to Ms. Rowe, it seems quite possible that Mr. Reed may not have had time to sign it before leaving the Bank, or that even if he did, Mr. Stocker may have left the building before seeing Mr. Reed's signed form.

Third, the trial court heard testimony that appellant was coaching the ailing Mr. Reed to complete the transaction, suggesting that appellant had a pecuniary motive not to tell the truth about when the Transfer Form was signed (so that she rather than Ms. Rowe would be "one rich lady" after the death of Mr. Reed). Further, although the trial court found without discussion that Mr. Reed signed the Transfer Form on August 23, 2011, the date next to his signature on the form ("8-23 2011"), is unlike the date format Mr. Reed used in signing the several other documents in the record that bear his signature. The difference suggests some irregularity in the signing of the form.

For all these reasons, we will not disturb the trial court's finding that the Bank did not receive signed written notice of Mr. Reed's intent to alter the terms of his investment account. "We may not substitute our judgment on conflicting evidence for that of the trial court." *Modern Eng'g & Serv. Corp. v. McCrea*, 46 A.2d 767, 768 (D.C. 1946). As the Supreme Court of California aptly put it long ago, it is when the "evidence . . . is so conflicting that the finding of the trial court upon [a] question is conclusive on [an appellate] court." *In re Dow's Estate*, 183 P. 794, 797 (Cal. 1919).

By its terms, the UNTDA requires "written notice . . . signed by a party and received by the financial institution during the party's lifetime" to change the type of account. § 19-602.13 (a). We have not previously had occasion to interpret this provision, but most other jurisdictions that have applied their jurisdiction's version of this uniform law have held (at least as to multiple-party accounts and, in some jurisdictions, as to individually held accounts as well) that the provision is to be strictly applied according to its terms, such that mere verbal notice or other actual

(though unsigned) notice is not sufficient to alter the terms of the account.[6] *See Newman v. Thomas*, 652 N.W.2d 565, 573 (Neb. 2002) (holding, despite claim that before his death account holder Chamberlin had made an oral request to bank personnel that his friend Thomas be added as the payable-on-death beneficiary of the account, that "to add Thomas as a POD beneficiary, [the uniform non-probate transfer statute identical to § 19-602.13 (a)] required Chamberlin to give [the bank] signed written notice of the desired change"); *see also id.* at 572 (interpreting the statute "as setting out a mandatory method for altering the type of an account" and reasoning that "[r]equiring signed written notice to alter the type of account . . . ensur[es] clear evidence of the account owner's intent, thus preventing fraud and adding certainty to nonprobate transfers"); *Estate of Wolfinger v. Wolfinger*, 793 P.2d 393, 396 (Utah Ct. App. 1990) (holding that since there was no evidence presented showing a written request by the primary account holder to change the form of the account after he had previously added his daughter as a joint payee, the daughter was entitled to the funds in the account after the father's death (applying provision as set out in Uniform Probate Code)); *In re Estate of Leier*, 524 N.W.2d 106, 110 (N.D. 1994) ("A right of survivorship in an account . . . can only be

---

[6] Some of these jurisdictions' versions of the "uniform" law refer to alterations in the "the form of the account" (*e.g.*, Utah Code Ann. § 75-6-105 (2018)) rather than the "type of the account," as § 19-602.13 (a) does, but we do not perceive these differences to be material.

altered by a written notice given by the party to the financial institution." (applying provision as set out in Uniform Probate Code) (brackets and internal quotation marks omitted)); *Linehan v. First Nat'l Bank*, 579 N.W.2d 157, 160 (Neb. Ct. App. 1998) ("[A]fter a joint account has already been created[,] . . . a signed written order is necessary to modify the terms of the account.");[7] *cf. Jordan v. Burgbacher*, 883 P.2d 458, 464 (Ariz. Ct. App. 1994) (applying nonprobate transfer statute similar to the uniform version and holding that "[t]he question whether the account holder intended or attempted to communicate an account change order to the bank is not material . . . . It is the receipt of the written order by the bank that is material.").

While the foregoing decisions are not binding on us, they are persuasive authority as to the meaning of our version of the uniform law from which § 19-602.13 is derived. Moreover, as we have previously observed, the UNTDA was enacted to address concerns about "fraud, overreaching, and deceit, often culminating after the other party to the transaction is dead." *Dennis v. Edwards*,

---

[7] *But see Jampol v. Farmer*, 524 S.E.2d 436, 439 (Va. 2000) (holding, as to the decedent's solely owned certificates of deposits, that the Virginia statute almost identical to our § 19-602.13 (a) "does not mandate that a change in the terms of a CD must be made with a writing. Rather, the statute merely provides that the form of the account 'may' be altered by a written order, not that the form 'shall' be so altered").

831 A.2d 1006, 1012 (D.C. 2003).  Recognizing that the § 19-602.13 (a) reference to a written notice "signed by a party and received by the financial institution during the party's lifetime" was a response to those concerns, agreeing with the rulings in the cases cited above, and having declined to disturb the trial court's finding that Mr. Stocker did not see the signed Transfer Form before Mr. Reed's death, we must conclude that the court did not err in determining that no alteration in the account pursuant to the terms of § 19-602.13 (a) was accomplished before Mr. Reed's death.

**B.**

Ms. Reed also contends that Mr. Reed made an *inter vivos* gift of his RBC investment account funds to Ms. Reed.[8]  "The requisites of a valid gift *inter vivos*

---

[8]   We entertain this claim because the legislative history of the UNTDA indicates that the Council of the District of Columbia did not intend to render invalid all non-written *inter vivos* transfers of interests in bank deposit accounts. *See* Council of the District of Columbia, Comm. on the Judiciary, Report on Bill 13-298, The "Omnibus Trusts and Estates Amendment Act of 2000 [which adopted the UNTDA]" ("Committee Report") at 41 (stating that D.C. Code §19-601.1, which recognizes that account agreements and deposit agreements may include nontestamentary, written provisions for nonprobate transfers on death, "does not speak to the phenomenon of the oral trust to hold property at death for named persons, an arrangement already generally enforceable under trust law");

(continued…)

are delivery, intention on the part of the donor to make a gift, and absolute disposition of the subject of the gift." *Estate of Presgrave v. Stephens*, 529 A.2d 274, 280 (D.C. 1987) (internal quotation marks omitted). "The burden of proving that a transfer was an inter vivos gift is upon the party asserting the gift, and when the gift is asserted after the donor has died it must be established by clear and convincing evidence." *Id.* Where the putative gift is an account and, as here, "none of the money in the . . . account[] came from [the putative donee], the presumption arises that the account[] [was] set up for decedent's convenience rather than as a gift." *Id.* (footnote citation omitted); *see also* Committee Report at 41 (stating that the UNTDA "recognizes that a depositor may add another person to an account for various reasons," such as "simply to enable account transactions by a third person as a convenience without creating any ownership"). The presumption can be overcome by evidence that the putative donor intended to

---

(…continued)

*see also In re Estate of Blake*, 856 A.2d 1151, 1156 (D.C. 2004) ("The [UNTDA] does not effect a material change in the law with respect to whether the decedent made an *inter vivos* gift[.]"); *cf. Quander v. Dow*, 721 A.2d 977, 978 (D.C. 1998) (remanding for further proceedings litigation involving a claim that the funds in a bank account in the name of the appellant's father were held in trust for appellant, and declining to decide in the first instance whether the father's "utterance of the words that the funds belong to his son without some cognizable legal instrument which effectuates that intent, or his mere desire to use the funds in question for the . . . minor child, . . . create[d] a legal or cognizable interest in the same by the minor child").

create a present interest in the putative donee, such as by enabling the latter to use the gifted asset during the donor's lifetime. *Cf. Presgrave*, 529 A.2d at 280 (recounting testimony that donor "encouraged [the donee] to buy a new car" with the money in the jointly titled account).

Ms. Reed's *inter vivos* gift claim founders on the donative intent requirement (and thus we need not consider whether the other requirements were satisfied). The trial court correctly stated that "no intention to make a present gift [could be] imputed from [Mr. Reed's verbally stated desire to open] an account in two names[.]" *Estate of Blake*, 856 A.2d at 1156. The trial court specifically found that Mr. Stocker "had actual notice of Decedent's intent to discontinue [Ms. Rowe's] joint ownership title to the RBC Account[,]" not that Mr. Stocker had actual notice of Mr. Reed's intent to add Ms. Reed's name to the account; nevertheless, given the court's finding that Mr. Stocker prepared the Transfer Form that was sent (unsigned) to Ms. Rowe for her signature, we can assume that Mr. Stocker also had actual notice of Mr. Reed's intent to substitute the name of Ms. Reed for that of Ms. Rowe as the joint account holder. But, as *Estate of Blake* instructs, donative intent cannot be inferred from that alone, and we see in the record no other evidence of donative intent. For example, no evidence was presented that any of the funds in the RBC account were withdrawn (by anyone) at

Ms. Reed's direction or for her use during Mr. Reed's lifetime. *Cf. Estate of Blake*, 856 A.2d at 1156-57 (concluding that appellant did not meet his burden of showing that the decedent made an *inter vivos* gift when she added his name to bank accounts where "appellant never spent or took possession of the funds in any of the accounts and never treated them as his own").

How the other requisites for an *inter vivos* gift apply in the case of a bank account has been a matter of some dispute.[9] However, Ms. Reed's counsel acknowledged at oral argument that if — as the trial court found — a Transfer Form directing the removal of Ms. Rowe's name from the account and bearing Mr. Reed's signature was not received by Mr. Stocker, there was no delivery that could satisfy the requirements of an *inter vivos* gift. For the reasons discussed in the preceding paragraph, and for that additional reason as well, we hold that the trial

---

[9] *See, e.g.*, *Spark v. Canny*, 88 So. 2d 307, 311 (Fla. 1956) ("[T]he rules relating to gifts *inter vivos* cannot be strictly and literally applied in determining whether a joint bank account with right of survivorship has been established. Thus, the very nature of a joint bank account is such that one essential element of a gift *inter vivos* is missing — that of surrender of dominion and control by the donor — since each party has an equal right to withdraw the funds on deposit. Nor is the rule as to 'delivery' of the gift applicable in this situation." (citation omitted)), *superseded by statute as stated in In re Estate of Gainer*, 466 So. 2d 1055, 1057-58 (Fla. 1985).

court did not err in rejecting appellant's claim that Mr. Reed made an *inter vivos* gift to her of the RBC investment account.

**

For the foregoing reasons, the trial court did not err in determining that the funds in the RBC Bank account passed to Ms. Rowe pursuant to her right of survivorship. Wherefore, the judgment of the Superior Court is

*Affirmed*.