# District of Columbia
# Court of Appeals

**Nos. 14-PR-1298 and 14-PR-1299**

DAVID ROSS, *et al.*,

FILED

SEP 22 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

Appellants,

v.

BETTY J. BLACKWELL, *et al.*

**LIT-35-09;
ADM-1191-08**

Appellees.

On Appeal from the Superior Court of the District of Columbia
Probate Division

BEFORE: WASHINGTON, *Chief Judge*; THOMPSON, *Associate Judge*; and FERREN, Senior Judge.

## J U D G M E N T

This case was submitted to the court on the transcript of record and the briefs filed, and without presentation of oral argument. On consideration whereof, and for the reasons set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment of the trial court is affirmed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: September 22, 2016.

Opinion by Associate Judge Phyllis D. Thompson.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 14-PR-1298 and 14-PR-1299

DAVID ROSS, *et al.*, APPELLANTS,

V.

BETTY J. BLACKWELL *et al.*, APPELLEES.

FILED 9/22/16
District of Columbia
Court of Appeals

*Julio Castillo*
Julio Castillo
Clerk of Court

Appeals from the Superior Court
of the District of Columbia
(LIT-35-09 and ADM-1191-08)

(Hon. John M. Campbell, Trial Judge)

(Argued March 22, 2016          Decided September 22, 2016)

*Ferguson Evans* with whom *Oliver D. Long* was on the brief, for appellants.

*Robert Bunn* for appellees.

Before WASHINGTON, *Chief Judge*, THOMPSON, *Associate Judge*, and FERREN, *Senior Judge*.

THOMPSON, *Associate Judge*: After a bench trial in a probate proceeding, the Superior Court (the Honorable John Campbell) ruled that the August 25, 2003, and September 9, 2008, wills executed by decedent Elsie Hamilton,[1] in which

---

[1] Hamilton died in October 2008.

Hamilton named appellants David Ross and his wife Daphne Arrindell as sole beneficiaries of her estate, are "void as being the product of undue influence." In a separate order in a related estate-administration proceeding, Judge Campbell approved the Auditor Master's Report and ruled that appellants are liable for the balance (plus interest, penalties, and costs) due on a $127,000 mortgage loan they took out in September 2005 using Hamilton's home as collateral. In these consolidated appeals, appellants argue that Judge Campbell (1) applied an erroneous legal standard and erred in invalidating the 2003 and 2008 wills; and (2) erred in holding appellants liable for the outstanding balance of the mortgage loan amount without giving them credit for the "provable expenditures" they incurred to renovate Hamilton's house. We affirm.

## I.

When reviewing a trial court's ruling after a bench trial, this court "may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C. § 17-305 (a) (2012 Repl.). Under this standard of review, we view the evidence in the light most favorable to the prevailing party, *see Real Estate Escrow, Inc. v. Fitzgerald*, 846 A.2d 289, 290

(D.C. 2004), and "[w]e defer to the trial court's credibility determinations unless they are clearly erroneous." *In re Estate of Bates*, 948 A.2d 518, 527 (D.C. 2008). The "plainly wrong" standard "means that if the trial court's determination is plausible in light of the record viewed in its entirety, we will not disturb it whether or not we might have viewed the evidence differently ourselves." *Hildreth Consulting Engineers, P.C. v. Larry E. Knight, Inc.*, 801 A.2d 967, 971-72 (D.C. 2002) (internal quotation marks omitted). "Where the facts admit of more than one interpretation, [we] must defer to the trial court's judgment." *Id.* at 972 (internal quotation marks omitted). "Undue influence is a mixed question of fact and law, and our review of the legal issues is *de novo*." *In re Ingersoll Trust*, 950 A.2d 672, 692 (D.C. 2008).

We review the trial court's approval of an auditor master's recommendations for abuse of discretion. *See Rosendorf v. Toomey*, 349 A.2d 694, 702 (D.C. 1975) ("It was within the trial court's discretion to approve the Auditor-Master's recommendations as long as they were prepared with the requisite criteria in mind and were reasonable.").

## II.

Appellants contend that Judge Campbell erred in invalidating the 2003 and 2008 wills as the product of undue influence because the evidence showed that Hamilton was mentally sound at the time she asked her court-appointed conservator (attorney Philip Zipin) to prepare the will; and because the will is "entirely consistent with [her] history of testamentary planning," specifically her history of wanting, at the outset of a caregiving relationship, to leave her assets to her caregiver(s), out of gratitude.[2] Appellants also argue that Judge Campbell erred in applying the principle (accepted in some jurisdictions, but allegedly not in ours) that "a presumption of undue influence arises solely by the existence of a confidential or fiduciary relationship [of the type that existed between Hamilton and appellants] between the donor and donee[.]" Citing *Ingersoll*, 950 A.2d at 692-93, appellants assert that Judge Campbell failed to apply this jurisdiction's rule that "undue influence must always be proven." They contend that he "looked to 'suspicious' circumstances" rather than to "any hard proof of wrongdoing" and

---

[2] We note that although appellants assert in their statement of issues presented for review that the court erred in declaring both the 2003 and the 2008 wills invalid, they present argument only as to the 2003 will.

relied on inadmissible hearsay and "extraordinarily weak evidence" in reaching his findings.

We are not persuaded by these arguments. First, Judge Campbell recognized explicitly that "[i]t is not enough that there is a possibility or suspicion of undue influence." Second, although Judge Campbell stated that a "special circumstance applies . . . when a confidential or fiduciary relationship exists between the donor and beneficiary" and noted that "it has . . . been held" that a recipient has the burden of proving that a gift was not the product of undue influence, he concluded that the will-contestants (appellees Betty Blackwell et al.) had met their burden "even if [the burden] rests completely with the [appellees] to prove undue influence by clear and convincing evidence." Judge Campbell also told appellees' counsel during closing arguments at trial that "[y]ou guys have the burden of proof."

Third, while appellants are correct that the relevant evidence suggested that Hamilton had no significant cognitive impairments during the period in issue, Judge Campbell's ruling did not rest on a finding that Hamilton lacked testamentary capacity. Rather, he relied on the evidence that the nearly blind and bed-bound Hamilton was totally dependent on others — including appellants —

for her care, and was vulnerable to exploitation.[3] Fourth, Judge Campbell recognized that Hamilton had a history of bequeathing her assets to a caregiver (to wit, appellees' now-deceased mother Dorothy King, who was Hamilton's 1998-2000 caregiver and the beneficiary of Hamilton's 1998 will), but the judge also recounted the evidence that Hamilton and King had known each other since King was a teenager, had been friends for many years, and had a mother-daughter-type relationship. In contrast, Judge Campbell recognized, Hamilton had known appellant Ross, a roofing contractor hired to work on Hamilton's home, and his wife (appellant Arrindell) for only a few months before they obtained her power of attorney, and had known appellants for only several months when she changed her will in 2003 (executing the new will only four days after the court appointed appellant Ross to be her guardian) to name appellants sole beneficiaries.

Fifth, while appellants are correct that some of the evidence that they "isolated [Hamilton] from long-time friends" was based on what appears to be

---

[3] Judge Campbell had the report of the court-appointed examiner, who stated, on the basis of an August 2003 visit with Hamilton, that Hamilton was "vulnerable to exploitation from those in who[m] she had placed her trust to provide for her ongoing care needs."

hearsay, much of the hearsay testimony came in without objection.[4] "[U]nobjected-to hearsay may be competent evidence which the [factfinder] may consider." *Alsbrooks v. Washington Deliveries, Inc.*, 281 A.2d 220, 221 (D.C. 1971). Further, while appellants assert that there was "abundant counterevidence that no such isolation occurred" (for example, Ross testified that King hung up on *him* when he called her at Hamilton's request) and "paltry evidence" of any isolation of Hamilton, Judge Campbell was free to believe, and he specifically credited, the testimony by appellees' witnesses that appellants cut Hamilton off from her previous friends. The credited testimony about appellants' efforts to

---

[4] For example, appellants (who were pro se) made no objection to the testimony by King's daughter Angela Worthy that King told her in 2002 or 2003 that Ross "said that . . . he is not letting anyone in to see [Hamilton]" and that a few months later, when she and King stopped by Hamilton's house, Ross stated to King, "I asked you not to come her[e.]" Appellants also made no objection to the testimony by King's son Douglas Worthy that when King would try to reach Hamilton by telephone, King was told that Hamilton was unavailable or asleep; that, in contrast to what occurred before 2003, King's cards and phone calls to Hamilton were not acknowledged; that there was an occasion in 2003 when King tried to visit Hamilton and was turned away at the door; and that in 2003, King could not get a return call or "any communication to [Hamilton] or from her." Nor did appellants object to the testimony by Betty Blackwell, King's daughter, that King didn't go to visit Hamilton after 2001 because Ross did not allow her there; that when King would call Hamilton, Ross would say that Hamilton was unavailable or asleep; that King wasn't allowed to get in contact with Hamilton at all "from 2003," and that King went to Hamilton's house on numerous occasions and "they wouldn't allow her in" and "told [her] that she could not see Mrs. Hamilton." Contrary to appellants' suggestion that the record does not support Judge Campbell's finding that King previously (i.e., prior to appellants' involvement with Hamilton) visited Hamilton frequently, that was precisely the gist of Blackwell's testimony.

isolate Hamilton supported an inference that appellants were exerting undue influence over her in 2003.[5] Judge Campbell heard former conservator Zipin's testimony that Hamilton (not appellants) asked him to prepare a will (the 2003 will) leaving her house to appellants and that he was "satisfied that there was no und[ue] influence. But Zipin's testimony did not preclude the court from finding that appellants (who acknowledged in their depositions or trial testimony that they knew that Zipin would be drafting the 2003 will, heard some of Zipin's interview with Hamilton, and were present when the will was signed[6]) had exerted undue influence over Hamilton to prompt her to ask Zipin to prepare a new will for her.[7]

---

[5] *Cf. Fisher v. Estate of Welch*, 534 N.W.2d 109, 113 (Iowa Ct. App. 1995) (holding that the record, including evidence that the will-proponent isolated the testator from his family and friends, "clearly shows undue influence"); *Sheets v. Estate of Sheets*, 345 A.2d 493, 495 (Me. 1975) (finding of undue influence was "completely supported by the record," which included evidence that the will-proponents had "isolate[d]" the testator, who was "under their sole care and supervision [and] unable to function without their assistance," "from the counsel and companionship of his old friends"); *see also Ingersoll*, 950 A.2d at 688 ("[U]ndue influence began in July 1995, when William began to isolate his mother from contact with her then attorney[.]").

[6] Ross (who acknowledged during his testimony at trial that when he met Hamilton, he was having "problems with money flow" and "filed bankruptcy") also testified that he did not recall whether he had any discussions with Hamilton about the 2003 will before it was signed, and likewise did not recall whether he went over the will with Hamilton before she signed it.

[7] Zipin prepared the 2003 will, in which he named himself as the personal representative, while he was Hamilton's court-appointed conservator, and he did so

(continued…)

Moreover, it is clear from Judge Campbell's Order that, in his view, some of the most telling evidence that appellants were "maneuver[ing]" and "taking advantage" of Hamilton was their "cover up": specifically, as detailed at length by Judge Campbell, the evidence that appellants attempted to conceal their various actions from Hamilton's then-conservator and from the court. Judge Campbell noted that appellants failed to inform conservator Zipin about the mortgage they took out on Hamilton's house. The judge further emphasized that appellants had repeatedly misled or lied to the court, with one or both appellants telling the court that there was no mortgage on the house, which was "patently false"; failing to tell the court about Hamilton's medical condition when, a few days before her death, they asked the court for, and received, permission to sell her house; falsely telling the court that they had receipts showing how they had used the mortgage loan proceeds; falsely stating in a Guardianship Report that all of the loan proceeds were used to renovate Hamilton's house, and Ross's repeating that false statement under oath during his deposition; and failing to disclose to the court the 2008 changes to Hamilton's will that caused appellants, who were her court-appointed

---

(…continued)
without notifying the court. He agreed at trial that if the 2003 will was found valid, he would have "no liability." As appellees' counsel told the court, Zipin "ha[d] an interest in" having the 2003 will upheld.

fiduciaries,[8] to be both the sole beneficiaries of the will and the co-personal representatives. As Judge Campbell implicitly recognized, efforts at concealment can support an inference of undue influence.[9] Although much of the evidence of concealment, dishonesty, and other telling conduct relates to the period *after* the 2003 will was executed, it is relevant to the validity of the 2003 will inasmuch as it justified Judge Campbell's lack of credence in appellants' explanation of how that will came to be executed.

Appellants assert that the evidence of undue influence was "extraordinarily weak[,]" but this court has held that it "generally takes less to establish undue influence when [as here] a confidential relationship exists between the parties." *Roberts-Douglas v. Meares*, 624 A.2d 405, 420 (D.C. 1992) (explaining that the

---

[8] Ross was Hamilton's guardian and the holder of her power of attorney. Arrindell was the successor conservator.

[9] *Cf. Moore v. Smith*, 582 A.2d 1237, 1238, 1242 (Md. 1990) (finding no clear error in trial court's conclusion that there was undue influence in the procurement of testator's will where, among other facts, Moore, within a month of being hired by the testator as an aide, had an attorney prepare a will for the testator and "never advised the testator's family or friends of the new will until after the testator's death"); *Reed v. Shipp*, 308 So.2d 705, 708 (Ala. 1975) (stating that "concealing the making of the will after it was made" can give rise to a presumption of undue influence) (internal quotation marks omitted); *McCormack v. Berking*, 290 S.W.2d 145, 146, 151-52 (Mo. 1956) (evidence that the will-proponents stayed at the home of the testatrix while the new will was drafted and that the existence of the new will was concealed were among the facts that made a "[jury-] submissible case on undue influence").

term "confidential relationship" "embraces 'both technical fiduciary relations and those informal relations which exist when one man trusts and relies upon another'") (internal quotation marks omitted). Here, there was not only the credited testimony of appellees' witnesses about appellants' cutting Hamilton off from her previous friends, but also what Judge Campbell found to be appellants' "smooth but evasive and self-serving testimony." We accord these express credibility determinations "considerable deference."[10] We also can find no clear error in Judge Campbell's inference that appellant's willingness to "pump[] money into renovating Ms. Hamilton's house" reflected a "complete assurance" that her house belonged irrevocably to them, a "confidence [that] could . . . be justified [only] by knowing that Ms. Hamilton was by that point effectively . . . under their control." That finding satisfies the legal test of undue influence, which is influence that "destroy[s] free agency." *Ingersoll*, 950 A.2d at 702 (internal quotation marks omitted); *see also Meares*, 624 A.2d at 419 ("[U]ndue influence [occurs] when the free agency of [the] donor has been destroyed, so that conveyance is effected by the will of the donee, not of the donor.").

---

[10] *Jones v. United States*, 828 A.2d 169, 174 (D.C. 2003) (internal quotation marks omitted).

Judge Campbell's finding of undue influence is "plausible in light of the record viewed in its entirety," *Hildreth*, 801 A.2d at 971 (internal quotation marks omitted), meaning that we may not disturb it even if "we might have viewed the evidence differently ourselves." *Id.* at 972. For that and all the foregoing reasons, we uphold his ruling declaring the 2003 and 2008 wills invalid.

## III.

On September 17, 2010, Judge Campbell issued an Order of Reference to the Auditor Master, by which he asked the Auditor Master to prepare a final account for appellants as "the removed co-personal rep[resentative]s" of Hamilton's estate. On April 29, 2011, following an evidentiary hearing, the Auditor Master submitted his Report, in which he recommended that, if the 2003 and 2008 wills were determined by the court to be invalid, a judgment should be entered against appellants "for the full amount that is outstanding on the loan that they secured on the property." Judge Campbell approved the Auditor Master's Report and issued the recommended judgment on October 8, 2014 (the day before issuance of his written order declaring the 2003 and 2008 wills invalid), explicitly adopting the Auditor Master's factual findings.

Appellants contend that Judge Campbell erred by approving the Auditor Master's Report without holding that "their provable expenditures [i]n renovating [Hamilton's] property should be offset against the liability imposed" on them pursuant to the Report.[11] They argue that the order holding them liable "should be reversed and remanded, so that an evidentiary hearing may be held to determine the value they expended from their own funds on renovations" to Hamilton's home, and "so that such credits may properly be offset against the outstanding loan value[.]" Appellants assert that the renovation expenditures were allowable costs and were, pursuant to D.C. Code § 21-2070 (c)(8), consistent with the authority of Hamilton's conservator (Arrindell, during the time period in issue) to make repairs and alterations to Hamilton's property.

Other than standard boilerplate language, the Order of Reference to the Auditor Master contains only handwritten notations about the failure of appellants, "the removed co-personal rep[resentative]s" of Hamilton's estate, "to file a satisfactory final account" and a checked box indicating that "it is necessary to have the account stated by the Auditor Master." Appellants acknowledge, however, that the Order of Reference referred to the Auditor Master the accusation

---

[11] Appellants contend that they spent over $253,000 of their own funds, mostly generated from the sale of realty that they owned, to renovate Hamilton's home.

by the successor administrator of Hamilton's estate "that a $127,000 mortgage loan remained unaccounted for." At the December 9, 2010, hearing, the Auditor Master ruled that the hearing would not "deal[] with" expenditures that appellants paid out of pocket (but would deal with expenditures they made with mortgage loan proceeds); the Auditor Master would not "deal with any of the receipts and documentation that [appellants] have about money that they spent on their own." He told the parties that that was "something for [appellants] to deal with later" should it "become[] germane to anything." He explained that the case "wasn't referred for that" purpose, but rather (to his understanding), was "referred primarily for the loan proceeds[.]"

During the hearing before the Auditor Master, Ross testified that the renovation work on Hamilton's house was done to render the house "habitable" and to replace door frames to accommodate the passage of Hamilton's wheelchair. He further testified, however, that the work also included, *inter alia*, grading the yard, replacement of a back porch with a deck, restoration of the front porch and columns, new fencing, "pull[ing] out small trees," tiling the guest bathroom, new roofing of a type that would keep the house "attractive as a Victorian type house," and other "cosmetic kinds of things." Ross testified that "all the renovations were done and in good taste and in a safe manner [so] that we all could live there as a

family." In addition, Ross told the Auditor Master that appellants "wanted to make sure th[e] house would be finished in the event we had to put it on the market."

The Auditor Master entertained the foregoing evidence about the renovation work because he was under the impression that appellants had used the mortgage loan proceeds to finance the work. Upon learning from Ross's further testimony that "no part of [the mortgage loan proceeds] directly went to any repairs," [12] that the loan proceeds were largely spent on a scam investment, and that the renovation work to Hamilton's house was done with funds appellants obtained by selling their own home after they moved into Hamilton's home, the Auditor Master declared that there was no need to continue the hearing; he "just need[ed] to report to the court that [the mortgage loan balance] should be charged to [appellants]."[13]

Appellants have not shown that the Auditor Master's understanding of the mandated scope of his assignment was unreasonable or that Judge Campbell

---

[12] The Auditor Master found that Hamilton's estate "did not benefit from the proceeds of the refinance."

[13] The Auditor Master found that appellants were, however, entitled to a credit for $9,155.94 for estate-administration expenditures from their personal funds for funeral expenses, the fee for opening the estate account, a claim against the estate for certain legal fees, fees for newspaper notices, and court costs.

accepted the Auditor Master's recommendation even though it was not "supported by the facts"[14] or was "prepared with[out] the requisite criteria in mind[.]"[15]  In addition, we cannot agree with appellants that Judge Campbell abused his discretion in not giving them a (further) opportunity to prove the amounts of their out-of-pocket outlays to renovate Hamilton's house before accepting (or as a condition of accepting) the Auditor Master's recommendation.  During the probate trial, appellants presented no testimony about their expenditures for the renovations; instead, after the close of the evidence, Arrindell merely pointed to a stack of receipts appellants had brought to court with them.  Judge Campbell reasoned that "the fact that there are receipts isn't going to mean anything unless we've had testimony identifying them and so forth."  Appellants did not object or otherwise argue the point.  As the record makes clear, Judge Campbell's order accepting the Auditor Master's recommendation was issued after the probate trial.  Thus, Judge Campbell knew that appellants had forgone the opportunity at trial to present testimony about renovation expenditures.  For this reason, too, we can find no abuse of discretion in the judge's decision to accept the Auditor Master's recommendation without more.

---

[14]  *In re Estate of Elkins*, 692 A.2d 910, 911 (D.C. 1995) ("[O]ur review of the trial court's ruling is limited to determining whether the Auditor's report was supported by the facts.").

[15]  *Rosendorf*, 349 A.2d at 702.

We also note that, contrary to appellants' assertion that the renovation expenditures were "allowable," it is far from clear that the expenditures were chargeable to Hamilton's estate (except perhaps insofar as they were to accommodate Hamilton's wheelchair or were no more than necessary to render her living space habitable[16]). D.C. Code § 21-2070 (c)(8) provides that a conservator may, *inter alia*, "[m]ake ordinary or extraordinary repairs or alterations in buildings or other structures, demolish any improvements, and raze existing or erect new party walls or buildings[.]" But the conservator may do so only when "acting reasonably in efforts to accomplish a purpose of [his or her] appointment," D.C. Code § 21-2070 (c), and it is clear from D.C. Code § 21-2051 (b) that a conservator's exercise of her powers must be for the purpose of prevention of waste or dissipation of the ward's property or "for the support, care, and welfare" of the ward. D.C. Code § 21-2051 (b)(2). Appellants' expenditures for "cosmetic kinds of things," for improvements that were not designed to meet Hamilton's needs but instead to enable appellants to live in the house with Hamilton "as a family," and for items in contemplation of putting the house "on the market," do

---

[16] As to those limited categories of expenditures, it appears the appropriate course would have been for appellants to file timely claims against the estate. They perhaps were unable to do this since, as Arrindell told the Auditor Master, she didn't "think [appellants had the particular expenditure amounts] written on any paper[.]"

not appear to be expenditures that were necessary to prevent waste or that were for Hamilton's support, care, and welfare.

Finally, it appears that to the extent that there was economic benefit from the renovations, the benefit was not to Hamilton's estate but to the beneficiaries of the (valid) 1998 will. During the hearing before the Auditor Master, the successor personal representative stated that Hamilton's house would have to be sold since it was burdened with the mortgage. To the extent the renovations added market value to the house, appellants' funding of the renovations may have given them a claim to that added value. If appellants do have a claim with respect to any *value* added by the renovation work, the claim would appear to be against the beneficiaries who received the sales proceeds.[17] Appellants are not, however, entitled to deduct their renovation e*xpenditures* from their indebtedness to the estate. For this reason, too, we cannot say that Judge Campbell abused his

---

[17] *Cf. In re Estate of Yelvington*, 280 So.2d 497, 499 (Fla. Dist. Ct. App. 1973) (recounting that one Conrad Yelvington, the sole beneficiary of a real-property devise contained in the will of his still-living mother, took possession of the property and thereon "constructed a valuable improvement"; reasoning that when the mother thereafter changed her will and divided the property equally among her children, and subsequently died, the facts "might give rise to some form of unjust enrichment proceeding against the other heirs"); *TVL Associates v. A & M Constr. Corp.*, 474 A.2d 156, 160 (D.C. 1984) (Ferren, J., concurring) (under a theory of unjust enrichment, the claim is for the value of benefits conferred).

discretion in not convening a hearing in the probate/estate administration proceeding for appellants to pursue recovery of their renovation costs.

## IV.

For the foregoing reasons, the judgment of the trial court is

*Affirmed*.