*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-AA-169

DANNY P. DIVVER, PETITIONER,

V.

D.C. DEPARTMENT OF INSURANCE, SECURITIES & BANKING, RESPONDENT.

On Petition for Review of a Final Decision and Order of the
Commissioner of the Department of Insurance, Securities and Banking
of the District of Columbia
(Case No. SB-1516(A))

(Argued September 19, 2023     Decided December 28, 2023)

*Stuart M.G. Seraina,* for petitioner.

*Thais-Lyn Trayer*, Deputy Solicitor General, with whom *Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Ethan P. Fallon*, Assistant Attorney General, were on the brief, for respondent.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and DEAHL and HOWARD, *Associate Judges*.

DEAHL, *Associate Judge*: Danny Divver was a financial adviser and insurance broker whose now-deceased client, Marianne Delin, left him nearly the entirety of her roughly $500,000 estate. That drew the attention of regulators, including the

Department of Insurance, Securities, and Banking ("DISB"), which investigated Divver. After an evidentiary hearing, the DISB concluded that Divver had exerted undue influence over Delin's decision to name him the beneficiary of her estate, ordered Divver to repay the ill-gotten funds, imposed a civil penalty against him, and permanently barred him from engaging in the securities and investment advisory business in the District.

Divver now petitions this court for review, arguing that the DISB made three principal errors: (1) it applied incorrect legal standards when determining that he engaged in undue influence; (2) under the correct standards, there was insufficient evidence to conclude that Divver engaged in undue influence; and (3) the DISB had no authority to order restitution under the circumstances of this case because there was no victim who could be made whole through an order of restitution. We agree with him on the first point, reserve judgment on the second, and disagree with him on the third. We therefore vacate the DISB's order and remand for further consideration in light of this opinion.

## I. Facts and Procedural Background

### *Divver Becomes the Beneficiary of Delin's Estate*

At the core of this case is how Divver came to be the beneficiary of Delin's estate. Before the events underlying this case, Divver was a licensed investment adviser and insurance broker. He first met Delin when he sold her a Medicare Supplement policy in 1990, when Delin was in her mid-60s. Divver testified that over the ensuing decades he would regularly visit Delin to help her file Medicare claims, and through those visits they became close friends, with Delin vacationing with the Divver family in 1997. In addition to being Delin's insurance broker, Divver became her securities broker, financial adviser, and emergency contact, and he held her durable power of attorney. Over the years he sold her various financial instruments, including an annuity from Transamerica Life Insurance that eventually accounted for the bulk of her assets, worth over half-a-million dollars.

In 2005, Delin was on the cusp of turning 80 years old and sought to make end-of-life preparations. Divver introduced her to Thomas Downs, an attorney specializing in trusts and estates, to help. Downs was Divver's own estate planning attorney as well as his friend, and the two of them often referred clients to each other. Downs prepared a living trust for Delin in which she was the trustee and she named Divver the successor trustee. In her living trust, Delin listed just ten "family"

members, three of whom—including Divver—were identified as friends. The trust specified that upon Delin's death, Divver would receive $10,000—the same amount as each of Delin's five nieces and nephews and another one of her friends—as well as the vast bulk of her personal property (not including her jewelry, which Delin had earmarked for another friend, Lisa Leval). Delin also named Divver the executor of her estate and designated him as her agent under a medical power of attorney. The remainder of Delin's estate would go to her sister, Sonja Lewin, and Lewin's husband.

Delin was close with her sister, who (like Delin's nieces and nephews) lived in Sweden. Delin had no family in the United States but was close friends with some of her neighbors, as she had lived in her apartment building for almost 50 years and had strong social ties to the community there. One neighbor with whom she was close, Brant Levine, helped Delin with a variety of needs over the years: shopping, running errands, calling Ubers, and the like. In 2013, when Delin was in her late 80s, she fell at home and was hospitalized. Levine encouraged her to move into an assisted living center, and Delin ultimately heeded that advice.

In April 2014, in what turned out to be the final year of her life, Delin moved into an assisted living center. Levine testified that after the move, Delin communicated less frequently with her former neighbors, and that her health

appeared to be in decline. At the same time, Divver became heavily involved in her care. He accompanied her to doctors' appointments, ran errands for her, and helped her manage her medications. In July 2014, Divver contacted Downs's office to say that "there may well be some changes to be made" to Delin's will. Over the following months Downs and Delin discussed those changes, and in October of that year, Divver drove Delin to Downs's office, where Delin executed new trust and estate documents. These documents made Divver the nearly sole beneficiary of Delin's estate, giving him everything except for her jewelry and some porcelain dishes, which she earmarked for her friend, Leval. The documents explicitly stated that Delin was intentionally not leaving money to any family members because she "believe[d] they already have sufficient assets." A few days later, Divver drove Delin to her bank where she removed her sister as joint owner of her checking account and added Divver as joint owner instead. Delin told Divver that she had made him the beneficiary of her estate after making those changes to her will.

By January 2015, Delin was visibly unwell and there was mounting evidence that she was suffering from mental decline. Around that time she was diagnosed with late-stage pancreatic cancer and she opted for hospice care. On March 2, 2015, Delin slipped into a coma and her doctors told Divver she had but a short time to live. In the days that immediately followed, as Delin was comatose, Divver transferred $76,000 from Delin's bank account to his and his son's bank accounts.

Delin then died on March 7, 2015. Within weeks, Divver attempted to collect the death benefit from her Transamerica annuity.

*The Fallout After Delin's Death*

Following Delin's death, Divver's beneficiary status came under heavy scrutiny. Levine had been suspicious of Divver for some time, given that Divver had become more involved in Delin's care when she was increasingly vulnerable. Levine asked Divver if he was a beneficiary of Delin's estate, and Divver said he was not. Still suspicious, Levine reported his concerns to the DISB, the Financial Industry Regulatory Authority ("FINRA"), and the police; he contacted the Legal Counsel for the Elderly; and he wrote a letter to Divver's employer, SagePoint Financial. SagePoint had a policy against its advisers being the beneficiaries of their clients' estates or holding their powers of attorney without the company's approval. But Divver, who was aware of this policy and knew he was Delin's beneficiary and held her power of attorney for some time, did not apprise SagePoint of that information.

Meanwhile, Divver moved quickly to collect the $547,358.02 death benefit from Delin's Transamerica annuity. He filed a claim for the lump-sum payment of that amount on March 24—seventeen days after Delin's death—and Transamerica issued the check to Divver two days later. But just before Divver could cash the

check, SagePoint notified Transamerica that Divver had sold Delin the annuity he was trying to collect on, and Transamerica stopped payment on the check so that Divver was ultimately never able to cash it. Transamerica then filed an interpleader action in Maryland to determine whether Divver or Delin's sister, Lewin, was entitled to Delin's annuity death benefit. Divver and Lewin settled that dispute in 2016, splitting the estate evenly: Divver received $233,818.20 and was permitted to keep the $76,000 he had already withdrawn from Delin's account, while Lewin received the remaining $309,818.20. That settlement agreement explicitly released all claims Lewin had against Divver. FINRA also investigated Divver and concluded that his failures to disclose his power of attorney and beneficiary status violated FINRA rules. Divver eventually agreed to a $10,000 fine and a nine-month suspension from associating with any FINRA member, without admitting to the violations FINRA had found.

The DISB also commenced this action, alleging that Divver violated a variety of laws relating to the provision of securities and insurance. A hearing officer heard five days of testimony, after which she concluded that Divver had engaged in unethical and dishonest conduct and had violated D.C. law.[1] The hearing officer

---

[1] As permitted by regulation, the DISB Commissioner delegated her authority to conduct a hearing to a hearing officer, who made proposed findings of facts and conclusions of law. 26-B D.C.M.R. § 301. The Commissioner then issued a final

credited the testimonies of Levine and Dr. Peter Lichtenberg—the DISB's expert witness on undue influence—and generally found Divver to be not credible. The Commissioner's order largely adopted the hearing officer's findings, including that Divver "employ[ed] a device, scheme, or artifice to defraud" Delin, in violation of D.C. Code § 31-5605.02(a)(1)(A), by exerting undue influence over her. The Commissioner ordered that Divver's insurance producer's license be revoked, that he be permanently barred from the securities business in the District, that he pay a civil penalty of $40,000 and hearing costs of $10,000 to the District of Columbia, and that he pay $233,818.20 plus interest—the amount he received in his settlement with Lewin—in restitution "to the estate of [] Marianne Delin."

In an earlier petition to this court, Divver pointed out that Delin's 2014 will made Divver himself the beneficiary of Delin's estate, so that he had effectively been ordered to pay restitution to himself. On the DISB's motion we remanded to the Commissioner, who amended her order so that it directed Divver to pay restitution to "the descendants of Marianne Delin" instead.

Divver now petitions this court to review the amended order.

---

order based on the hearing officer's report and the parties' responses to it. *Id.* at § 316.

## II. Undue Influence

### A. The DISB Misconstrued the Law of Undue Influence

Divver first argues that the DISB applied the incorrect legal standard when it concluded that he exerted undue influence over Delin. We will "affirm an agency's decision 'if the decision contains findings on each material, contested issue of fact; substantial evidence supports each factual finding; the decision's legal conclusions flow rationally from the factual findings; and the decision is not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.'" *Fort Myer Constr. Corp. v. Briscoe*, 298 A.3d 770, 775-76 (D.C. 2023) (quoting *Tyler v. George Washington Med. Fac. Assocs.*, 75 A.3d 211, 213 (D.C. 2013)). "Undue influence is a mixed question of fact and law," and we review Divver's legal complaints de novo. *In re Ingersoll Trust*, 950 A.2d 672, 692 (D.C. 2008).

Divver argues that the DISB Commissioner made two vital legal errors when articulating the law of undue influence: (1) she misstated the core definition of undue influence, and (2) she mistakenly opined that there is a presumption of undue influence when the alleged influence is exerted by a fiduciary. Because undue influence is the only basis under which the Commissioner concluded that Divver "employ[ed] a device, scheme, or artifice to defraud" Delin in violation of D.C. Code

§ 31-5605.02, Divver argues that these errors leave the Commissioner's rulings unsustainable. We agree.

## 1. The Commissioner applied the incorrect legal test

The Commissioner's first legal error was that she articulated a much more relaxed standard for undue influence than what is recognized in the District. Under our precedents, "undue influence consists of 'physical or moral coercion that forces the testator to exercise the judgment of another rather than [their] own.' . . . '[T]he pressure on the testator must destroy [their] agency and free will.'" *Roberts-Douglas v. Meares*, 624 A.2d 405, 418 (D.C. 1992), *modified on reh'g*, 624 A.2d 431 (D.C. 1993) (citations omitted). Where "no facts show[] that [the testator's] free agency was destroyed or that the will was a direct result of force or coercion," there can be no finding of undue influence. *Himmelfarb v. Greenspoon*, 411 A.2d 979, 984 (D.C. 1980). In short, "there must be proof of coercion," *In re Ingersoll Trust*, 950 A.2d at 692, and "[m]ere suspicion [of it] is insufficient," *Himmelfarb*, 411 A.2d at 984.

The Commissioner's brief statement of the law of undue influence did not align with those relevant standards or cite to any relevant precedents. Instead, the Commissioner described a very different inquiry. Here it is in its entirety, with the penultimate sentence doing most of the work:

The general rule regarding undue influence is when a "dominant party or influential party on one side may exert influence against a dependent or submissive one on the other. The parties are frequently in a relationship that justifies the dependent party in trusting the other, in relying on his judgment, and in assuming that the dominant party will be motivated by the dependent[] party's welfare and interests." *Dan B. Dobbs, Law of Remedies, Damages, Equity, Restitution*, § 10.3 (2d ed. 2001). *The dominant[] party's conduct counts as undue influence when he uses his position to sway the judgment of the other by advice or suggestion, or even by implication.* Much of the law of undue influence appears to be part of the law of confidential relationships. *Id.*

Order at 55 (cleaned up, emphasis added). Where our precedents require "pressure [that] destroy[s] [another's] agency and free will," *Meares*, 624 A.2d at 418 (citation omitted), the Commissioner's definition would find undue influence when a dominant party "sway[s] the judgment of the other." Although undue influence cannot exist without "coercion," *In re Ingersoll Trust*, 950 A.2d at 692, the Commissioner's definition would find it in "advice or suggestion."

To illustrate the chasm between the correct standard and the one adopted by the Commissioner, consider *Meares*, in which a group of parishioners sued their church leaders for undue influence because the leaders coerced members to donate beyond their means to help finance a new church building. 624 A.2d at 408. The parishioners alleged that church leaders badgered them from the pulpit to donate, purported to be channeling the "voice of God" while doing so, threatened them with

divine retribution and excommunication, and made some walk a "gauntlet" of hostile church members and face public shaming when they did not make sufficient contributions. *Id.* at 411-12. There was no question that the church leaders, who "occupied a position of trust and confidence vis-a-vis their parishioners," *id.* at 409, 420-21, used those positions to sway the judgment of the parishioners by advice or suggestion (to put it mildly). The Commissioner's averred test here thus would have been readily satisfied. We nonetheless upheld a grant of summary judgment against the parishioners after concluding that the evidence was insufficient to show that their "free agency" had "been destroyed" so that their donations were "effected by the will of the [church leaders], not of the [parishioners]." *Id.* at 419.[2]

By contrast, when we have upheld undue influence findings, the facts show something far starker than the mere advice or suggestion of somebody in a position of trust. For example, in *Ross v. Blackwell*, Ross was a roofing contractor who was hired to do some work for an elderly, disabled, "nearly blind and bed-bound" woman

---

[2] We initially reversed the grant of summary judgment as to one couple who alleged that in addition to being aggressively solicited and having to walk the gauntlet, church leaders also came to their home and pressured them to sell it to raise funds for the church. *Id.* at 425-26. We later, on petition for rehearing, revised our judgment and upheld the grant of summary judgment against even that couple, after they conceded (1) they were made to walk the gauntlet only after making their donation in question, and (2) the pressure to sell their house was little more than a "suggestion." *Meares*, 624 A.2d at 432.

named Hamilton. 146 A.3d 385, 388-90 (D.C. 2016). Ross and his wife then "cut Hamilton off from her previous friends," and within a few months of being hired to do roofing work, Ross had become Hamilton's guardian and his wife had become her conservator, despite neither one having any prior relationship with Hamilton. *Id.* at 389. Shortly thereafter, Hamilton named Ross and his wife the sole beneficiaries of her estate. *Id.* at 389. Meanwhile, Ross's wife took out a considerable mortgage against Hamilton's home. *Id.* at 390. When the whole affair came under judicial scrutiny, Ross and his wife "repeatedly misled or lied to the court, with one or both [of them] telling the court that there was no mortgage on the house, which was 'patently false,'" along with a host of other misrepresentations. *Id.* In total, we found that evidence was sufficient to support the conclusion that Ross and his wife had "destroy[ed Hamilton's] free agency," *id.* at 391 (citation omitted), through actions that went far beyond mere advice or suggestion.

At bottom, people are generally free to advise and persuade others to their own ends, even if those ends are noxious, the advice is self-serving, and they gained influence only through manipulative ingratiation.[3] The law of undue influence is

---

[3] When a fiduciary doles out self-serving advice against their client's interests, that of course might constitute a breach of fiduciary duties, and it can obviously be grounds for professional discipline. But those are distinct questions from whether they have exerted undue influence and destroyed their client's free will—not every

not a guardrail against being steered into bad decisions by opportunistic dirtbags. *MacMillan v. Knost*, 126 F.2d 235, 236 (D.C. Cir. 1942) ("One has the right to influence another to make a will in his favor . . . us[ing] argument and persuasion so long as it is fair and honest and does not go to an oppressive degree where it becomes coercive."). It is concerned only with coercion so severe that it can fairly be said that the person's free agency has been destroyed and displaced by another. The Commissioner announced a far more sweeping view of undue influence that is irreconcilable with our precedents. When applied to financial advisers like Divver, that erroneous definition would seem to sweep in a great deal of their legitimate work—they are, after all, paid to make suggestions and offer advice on financial decisions. The Commissioner's application of this incorrect legal test was error.

## 2. The Commissioner mistakenly invoked a presumption of undue influence

The Commissioner's second legal error was that she erroneously invoked a presumption of undue influence where a fiduciary relationship exists. This court has expressly rejected any such presumption: "Confidential relations [such as fiduciary relations] existing between the testator and the beneficiary do not alone furnish any presumption of undue influence; there must be proof of coercion." *In re Ingersoll*

---

breach of fiduciary duty or act of professional misconduct constitutes an exertion of undue influence.

*Trust*, 950 A.2d at 692 (citations omitted). Although "[i]t generally takes less to establish undue influence when a confidential relationship exists between the parties," *Meares*, 624 A.2d at 421 (citation omitted), that lower bar is not tantamount to creating a presumption of undue influence.

The District counters that it is not obvious that the Commissioner in fact gave any weight to this erroneous presumption in her legal analysis. The Commissioner noted only that the District's expert (Lichtenberg) opined that there was a presumption of undue influence where a fiduciary relationship exists, but the Commissioner's own legal conclusions did not expressly say anything about such a presumption. That is true so far as it goes, but it does not alleviate our concerns, given that (1) the Commissioner expressly credited Lichtenberg's testimony, without noting any reservation as to this point in her extremely brief legal analysis; (2) she never expressly disavowed this presumption, as our precedents have; (3) the Commissioner's own articulation of the relevant legal standards was so cursory that it appears that she simply accepted the legal framework articulated by Lichtenberg; and (4) the Commissioner's application of a more relaxed standard of undue influence than what this court recognizes seems of a piece with the application of this erroneous presumption.

At the very least, and given that we would vacate the Commissioner's order based on the first error identified above in any event, it is enough here to say that we have no assurance that the Commissioner did not apply this erroneous presumption. So we now reiterate that there is no presumption of undue influence stemming from fiduciary relationships. It instead remains the DISB's burden to establish that Divver exerted undue influence over Delin under the standards articulated above. Because the Commissioner did not address that relevant and exacting legal test, and seemed to invoke an erroneous presumption along the way, we vacate her order and remand for reconsideration.[4]

## B. Sufficiency of the Evidence of Undue Influence

Divver next argues that the evidence before the Commissioner could not support a finding of undue influence under the appropriate legal standards. If he were correct about that, we could direct judgment in his favor rather than remanding for further consideration. We conclude that it would be premature for us to resolve

---

[4] Divver hints at one more error in the Commissioner's legal analysis, suggesting that the DISB was required to provide "clear and convincing evidence" of undue influence, whereas the Commissioner applied a preponderance of the evidence standard. He makes no effort to develop this argument on appeal and so we do not address it. *Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work." (citation omitted)).

this question without the benefit of the Commissioner's application of the correct legal test, and so we reserve judgment on this question. But we nonetheless offer the following comments on the record evidence as guidance to the Commissioner.

There is rarely a smoking gun establishing undue influence. Such influence is usually exerted behind a veil of secrecy and often the most critical witness who could pierce that veil is deceased. That is why our precedents recognize that "[u]ndue influence is nearly always a matter of inference from facts and circumstances disclosed by the evidence of the conditions and surroundings of the parties." *Wiggins v. Smith*, 183 F.2d 831, 832 (D.C. Cir. 1950) (quoting *Barbour v. Moore*, 10 App. D.C. 30, 46 (D.C. Cir. 1897)). In other words, "undue influence may be established by circumstantial evidence," and its "existence may be inferred from such factors as disproportionate gifts made under unusual circumstances, the age and health of the donor, and the existence of a confidential relationship." *Meares*, 624 A.2d at 422 (quoting *In re The Bible Speaks*, 869 F.2d 628, 642 (1st Cir. 1989)). There is a fair bit of circumstantial evidence that could support a finding of undue influence here, but there is likewise circumstantial evidence that militates against such a finding, as we now explain.

## 1. Factors favoring a finding of undue influence

There are at least seven aspects of this case that provide some support for a finding of undue influence, and in combination, they might provide sufficient evidence of coercion to support an undue influence finding. They are (1) the sheer size of Delin's gift to Divver, as she channeled nearly her entire estate to him; (2) the fact that she did so just five months before her death, during which there was some evidence of her mental decline; (3) the fact that Divver was her fiduciary; (4) the evidence of Delin's near-total reliance on Divver during her final year; (5) her relative isolation from her social network; (6) the fact that Divver is the person who apparently initiated review of Delin's will and estate plans and brought her to her appointment with Downs; and (7) Divver's efforts to conceal what he was doing.

The first three factors do not require much elaboration. Divver had been listed as a beneficiary of Delin's estate since 2005, but up until the final months of her life, he stood to inherit a relatively modest sum of $10,000, in addition to most of her personal property. Just five months before her death, Delin altered her estate plan to leave Divver nearly all of her assets, worth over half a million dollars. That drastic change and its timing provide support for a finding of undue influence, as do the limited findings that Delin was experiencing some degree of cognitive decline at the

time.[5]  Divver's fiduciary status further supports a finding of undue influence, and "[w]here such a relationship is implicated, the validity of a purported gift is closely scrutinized" and "may be set aside . . . even though the transaction could not have been impeached in the absence of a confidential relationship." *Meares*, 624 A.2d at 421.  These three factors alone are far from conclusive—it is not so unusual for people to make drastic changes to their wills as death nears, which is precisely when estate planning most naturally comes into focus.  But in the panoply of circumstantial evidence, each of these three factors weighs in favor of finding undue influence. *Meares*, 624 A.2d at 422 (listing the size of the gift, its timing, and confidential relationships as factors in the inquiry).

The next three factors—Delin's extreme reliance on Divver, her relative isolation during her final year, and his apparent initiation of the review of her will—are interrelated.  After Delin moved into the assisted living center, Divver became

---

[5] On remand, it would be helpful if the Commissioner provided more detailed findings on the degree of cognitive decline that Delin was suffering at the time she made changes to her will, to the extent that is possible.  There was conflicting evidence on that topic, it is hotly disputed, and it could prove critical to the undue influence inquiry.  For similar reasons, it would be helpful to gauge the value of Delin's personal property that Divver stood to inherit under the 2005 will, because that figure affects how drastic the 2014 change in Delin's will was.  Finally, the Commissioner might wish to explain in more detail the degree to which Downs's testimony is credited, as he generally supported Divver's position that Delin voluntarily and intelligently chose to make him the beneficiary of her estate, at least so far as Downs could tell.

much more involved in many aspects of Delin's decisionmaking and care; as Delin told Levine, Divver "was taking care of everything now." This stands in contrast to the situation in *In re Ingersoll Trust*, where we held that there was no undue influence in part because nothing in the record suggested one person took over the "day-to-day financial decisions" of the other, or generally "controlled her assets during her lifetime." 950 A.2d at 695 (citation omitted). Here, by contrast, Divver was a co-owner of Delin's bank account, and as her financial adviser, he was largely responsible for the fact that substantially all of her assets ended up in a single financial instrument, the Transamerica annuity. There is reason to believe that Divver himself was the impetus for Delin changing her will in the final year of her life. Plus, during that final year Delin was largely isolated from others. While the degree and cause of that isolation is not clear—Delin told Levine that she simply did not want visitors—the mere fact of her isolation made her more susceptible to undue influence. *See Ross*, 146 A.3d at 389-90 (testator's isolation "supported an inference that appellants were exerting undue influence over her").[6]

---

[6] These factors can cut both ways. It would be one thing if Divver had taken affirmative steps to isolate Delin from her social circle, as was the case in *Ross*. 146 A.3d at 389. But there was little evidence of that. And it is quite another thing if Delin's social circle effectively abandoned her once she moved into her assisted living center, which could prompt somebody in Delin's position to divert her estate to the one person who was taking care of everything toward the end of her life, namely, Divver.

The seventh factor is Divver's concealment of his activities, a factor that we have given considerable weight to in past cases. *Ross*, 146 A.3d at 390 ("efforts at concealment" could "support an inference of undue influence"). Divver failed to tell his employer that he had been entrusted with Delin's power of attorney and had been named a beneficiary of her estate, despite knowing that he was required to disclose those facts. When Levine asked Divver directly whether he was the beneficiary of Delin's estate, Divver lied and said he was not. And while it is now undisputed that Divver was the one who called Downs's office in July 2014 and indicated that Delin wanted to make some changes to her will, Divver initially lied about that during his deposition testimony in the Divver/Lewin litigation. And most damning of all, Divver transferred $76,000 from Delin's bank account during the final days of her life without informing anybody—Delin herself was comatose—and he took steps to apparently cover his tracks, such as funneling some of that money to his son's bank account. These facts, in combination, are at least arguably sufficient to support a finding of undue influence.

## 2. Factors disfavoring a finding of undue influence

There are also at least six counterweights to a finding of undue influence worth cataloging, none of which we need to belabor here: (1) Divver had known Delin for decades before he became a beneficiary of her estate, not for mere months

(as was the case in *Ross*); (2) the evidence is undisputed that Divver and Delin were friends during those decades, and there is some evidence that they were quite close friends, including seemingly undisputed evidence that Delin had vacationed with Divver's family; (3) Delin had initially made Divver a beneficiary of her estate, identifying him as "family" back in 2005, a decade before her death when there was no question she was of sound mind and long before any suggestion of undue influence; (4) Delin made Divver the primary beneficiary of her estate after independent consultations with an attorney, Thomas Downs, who detected no evidence of mental frailty and no apparent coercion; (5) there is evidence that Divver did in fact "take care of everything" for Delin during her final year, as she herself put it, providing an explanation for why she might have freely chosen to divert her estate to him; and (6) there is evidence that there was simply no other obvious candidate to be Delin's beneficiary, as her sister was nearing death and Delin's nieces and nephews apparently did not need the money.[7]

---

[7] In Delin's 2005 will, she expressly noted one person who she was excluding as a beneficiary—Maud Carlsson—on the grounds that "she is financially secure." When Delin revised her will in 2014, she offered the same explanation for why she was omitting Lewin and her nieces and nephews as beneficiaries: she "believe[d] they already have sufficient assets." That is a facially plausible basis for Delin's 2014 changes to her will.

In short, there are a number of factors that cut both for and against a finding of undue influence here. We will not hazard a judgment about whether the evidence, when taken together, is sufficient to support a finding of undue influence under the appropriate legal standards. The Commissioner should take those relevant factors into account when applying the correct legal test for undue influence.

## III. The Commissioner Has Authority to Order Restitution

Divver argues that even if he had unduly influenced Delin, it was beyond the scope of the Commissioner's authority to direct him to pay restitution to Delin's descendants. While Divver acknowledges that the Commissioner is generally authorized to order restitution, *see* D.C. Code § 31-5606.02(b)(5), he argues that there is simply nobody to make whole in this case. The argument is a bit convoluted, but it is roughly (1) that Delin had no direct descendants; (2) so the order that Divver provide restitution to her descendants is effectively a directive to reimburse Lewin's estate, which had stood to inherit Delin's estate absent the 2014 changes to her will; and (3) because Divver and Lewin already settled all claims between them as part of the Maryland interpleader action, there is nobody to make whole through an order of restitution. We disagree, for three reasons.

First, it is simply not true that Lewin's willingness to accept a settlement of less than the entirety of Delin's estate means that she has been made whole absent

any further restitution. While Lewin may have relinquished any additional private causes of action against Divver through the 2016 settlement agreement, that private agreement does not bind the DISB in exercising its regulatory functions. The DISB remained free to conclude that Delin's estate had not been made whole, as private settlement agreements generally will not constrain an agency's enforcement powers. *See U.S. Commodity Futures Trading Comm'n v. Kratville*, 796 F.3d 873, 889 (8th Cir. 2015) ("[Q]uite apart from whether the individual victims are satisfied with their private settlements, full and ample restitution, and other equitable remedies such as disgorgement of profits, serve distinct deterrence functions that are vital to the '[]public interest.'" (citation omitted)). And people frequently settle claims at a discount, factoring in considerations of time, energy, and litigation risk, so the mere fact that Lewin settled her claims does not conclusively establish that she had been made whole. Divver has cited no authority for his novel position to the contrary, nor did he argue before the DISB that the settlement agreement had any preclusive effect on its ability to award restitution.

Second, restitution's central purpose is not simply to make a victim whole, but also to disgorge the wrongdoer of ill-gotten funds. *In re Hager*, 812 A.2d 904, 923 (D.C. 2002) ("the objective of restitution" is "preventing unjust enrichment" (quoting *In re Robertson*, 612 A.2d 1236, 1241 (D.C. 1992))); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 1, cmt. a (2011) (the "tradition from

which we receive the modern law of restitution authorizes a court to remedy unjust enrichment wherever it finds it"); Dan B. Dobbs, *Law of Remedies, Damages, Equity, Restitution* § 1.1 (2d ed. 2001) ("[R]estitution today is a general term for diverse kinds of recoveries aimed at preventing unjust enrichment of the defendant and measured by the defendant's gains."). The restitution order here can be justified on the sole basis of disgorging Divver of ill-gotten funds, even if the proper recipient of those ill-gotten funds might be up for debate. That debate does not truly concern Divver—he is no worse or better off no matter who the funds are directed to.[8]

Third, in Lewin's settlement with Divver, Lewin did not purport to release any claims that Delin's estate had against him. It is Delin's estate, not Lewin personally, which the DISB reasoned was wrongfully deprived by Divver's actions, and the restitution directed to Delin's descendants was directed at making the estate whole (while carving Divver out of the estate's beneficiaries). The fact that Lewin—

---

[8] Divver complains that it is impossible to pay restitution to Delin's "descendants" because she has none, so "the Commissioner has ordered that Divver pay restitution to unspecified individuals whose existence is uncertain." If Divver is genuinely in need of guidance about how to comply with the Commissioner's order, he can seek that guidance from the Commissioner herself if, after remand, the restitution order remains in place. But this does not appear to be an instance of genuine uncertainty. Divver instead seems to think that if it is unclear whom he must pay restitution to, then he should not have to pay restitution at all. That is wrong, as we have held that disgorging Divver of ill-gotten funds is justification enough for the DISB's restitution order.

or, now, Lewin's estate—might be the first in line to benefit from that restitution order is of no moment; she is simply not the same legal entity as Delin's estate.[9]

## IV.

We vacate the DISB's order and remand for reconsideration in light of this opinion.

*So ordered.*

---

[9] Divver's final argument is that the Commissioner did not have authority to amend her order after this court's initial remand because, in his view, the Commissioner's amendments exceeded the bounds that D.C. Superior Court Rule 60 places on the amendment of judgments. As an initial matter, Rule 60 is a court rule that has no direct application to the Commissioner's abilities to amend her orders. While the Commissioner nonetheless relied on Rule 60 as authority for her amended order, that was entirely unnecessary and we need not explore the bounds of Rule 60 now because the Commissioner's authority to amend her order on remand was already decided by this court in the prior appeal. In that prior appeal we expressly "remanded to the [DISB] for further proceedings consistent with the statements made in [the DISB's] motion," and as the DISB explained in its motion, the purpose of a remand was to permit the Commissioner "to issue an amended Final Decision and Order" along the very lines that it ultimately issued. Whatever bounds that Rule 60 places on the amendment of judgments in the abstract, even assuming those bounds might constrain the DISB, this court is clearly empowered to authorize an agency to amend its orders and judgments (just as sure as it is empowered to vacate those orders and judgments entirely). And in this case, this court already approved the Commissioner's amendment, so Divver's Rule 60 argument is meritless.